## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SERGEANT KATHLEEN RIDDELL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A.No. 04-1201-*** |
| | : | |
| THOMAS P. GORDON, individually and in his | : | |
| official capacity; SHERRY FREEBERY, | : | |
| individually and in her official capacity; | : | |
| COLONEL JOHN L.CUNNINGHAM, | : | |
| RETIRED, individually; COLONEL DAVID F. | : | |
| MCALLISTER, individually and in his official | : | Jury Trial Demanded |
| capacity: and NEW CASTLE COUNTY, a | : | |
| municipal corporation, | : | |
| | : | |
| Defendants. | : | |

### FIRST AMENDED COMPLAINT[1]

1.  Plaintiff and her husband opposed the election scheme of defendants Gordon and

Freebery to control the votes of four New Castle County Council members. As a direct

consequence, plaintiff, a long term New Castle County police officer, has been permanently

barred from further promotion in the New Castle County Police Department. She now brings this

civil action for compensatory and punitive damages and for injunctive relief for violations of her

right to vote and her rights to free speech, belief, association, and petition under the First, Ninth

and Fourteenth Amendments of the U.S. Constitution because: (a) in the 2002 Democratic

---

[1] No responsive pleadings having been filed, see Centifanti v. Nix, 865 F.2d 1422, 1431 n.9 (3d Cir. 1989); Albany Insur. Co. v. Almacenadora Somex, S.A., 5 F.3d 907, 910-11 (5th Cir. 1993), pursuant to Fed.R.Civ.P. 15(a), plaintiff amends her Complaint as of right. The Complaint has been rewritten to incorporate the facts underlying the related criminal guilty pleas of several defendants and key witnesses that occurred during the stay that was imposed after this case was filed nearly three years ago.

primary election for New Castle County Council District 6, while off-duty she campaigned for and

voted for her husband instead of Patty Powell, the candidate who was part of defendants Tom

Gordon and Sherry Freebery's election scheme, (b) she is a member of the Executive Board of

Directors of New Castle County Fraternal Order of Police Lodge No. 5 ("Lodge 5") who has

spoken out against the mistreatment and abuse of FOP members by the defendants, and (c) as the

Grievance Chairperson and/or Grievance Representative for Lodge 5 she has filed grievances and

represented aggrieved New Castle County police officers.

## I. JURISDICTION

2.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)

and (4), 28 U.S.C. §§ 2201 and 2202, and the First, Ninth and Fourteenth Amendments to the

U.S. Constitution.  The cause of action arises under 42 U.S.C. § 1983.  The claim arose in this

judicial district.

## II. THE PARTIES

3.  Plaintiff is a citizen of the United States and a resident of Landenberg, PA.  Since June

of 1988 she has been employed as a police officer of the municipal defendant.  She presently holds

the rank of Senior Sergeant.  At all times material hereto she has been a diligent, honest and loyal

employee who always performed her job in an exemplary manner.

4.  Defendant Thomas P. Gordon ("Gordon"), at all times material hereto, was the

incumbent County Executive of defendant New Castle County ("NCC").  He has pleaded guilty to

committing crimes while holding public office.  He is sued in his individual and official capacities

for retaliatory actions which were taken against plaintiff.

5.  Defendant Sherry Freebery ("Freebery") at all times material hereto, was the Chief

Administrative Officer of NCC.  She has pleaded guilty to committing crimes of dishonesty and

deception while holding public office.  She is sued in her individual and official capacities for retaliatory actions which were taken against plaintiff.

6.  Defendant John L. Cunningham ("Cunningham") was the  Colonel and highest ranking officer of the NCC Police Department  through June of 2003.  He has pleaded guilty to committing crimes while holding public office.  He is sued in his individual capacity for retaliatory actions against plaintiff which were taken prior to his retirement.

7.  Defendant David F. McAllister ("McAllister") was the Colonel of the NCC Police Department from July 29, 2003 until his forced resignation.  He is sued in both his individual and official capacities for retaliatory actions which were taken against plaintiff after he became Colonel.

8.  Defendant New Castle County is a municipal corporation under the laws of the State of Delaware.

### III.  FACTS GIVING RISE TO THE ACTION

#### A. Gordon and Freebery's Total Control of the Police Department

9.  Gordon and Freebery make all the personnel and promotion decisions for the NCC Police Department, and also when they demand it they otherwise exercise total control of day to day operations of the Department.  They and NCC additionally have a policy, practice and custom of retaliating against their political opponents within the Police Department and against Lodge 5 officers who will not accede to their demands for mistreatment of police officers.

10.  For example, their control of the Police Department is illustrated by the fact that defendant Cunningham on December 16, 2003 pled guilty in Superior Court to the crime of conspiracy in the third degree, in violation of 11 Del.C. § 511.  Therein he admitted that during August 2002 he agreed with defendant Freebery that one or both of them would engage in the

crime of official misconduct in violation of 11 Del.C. § 1211(2). To that end and out of fear of the personal consequences he would suffer at the hands of defendant Freebery, he pressured subordinate police officers to work during both working and non-working hours on the 2002 political campaigns of Patty Powell and William Tansey, two of the Council members who defendants Gordon and Freebery sought to control.

11. In his written guilty plea, defendant Cunningham further admitted that he pressured police officers to work on the Powell and Tansey campaigns "because he was directed to do so by his boss ... Sherry L. Freebery, and because he reasonably feared that if he did not comply with Ms. Freebery's directive he would suffer consequences that would significantly and negatively affect his employment." Consequently it is apparent that the highest ranking uniformed officer of the NCC Police Department will do whatever Gordon or Freebery order him to do out of fear of losing his employment. His loyalty to the men and women who serve under his command is non-existent.

12. As another example of Gordon and Freebery's total control over the operations of the Police Department, in retaliation for free speech on a matter of public concern, on or about June 12, 2001 Freebery also directed and caused a D.M., a County police officer, to violate the criminal law and access the classified DelJIS criminal records computer database to see if a citizen who had written a public letter critical of defendants Gordon and Freebery had a criminal record.

### B. The Election Scheme

13. To accomplish their objectives, Gordon and Freebery have sought to dominate, misuse, and control NCC government and to misuse the authority of their offices to create an atmosphere of intimidation so that Police Department employees, and other NCC employees, would comply with their orders, directions and requests, even if they were unlawful.

14. To accomplish these ends, in the 2002 elections defendants sought to control the votes of four New Castle County Council members. One vote which was available was that of Council District 6 where the incumbent was facing a criminal indictment which obviously hindered his chances of reelection. This seat also was in a traditional Democratic District.

15. Defendants chose Patty Powell to be their surrogate and threw their entire campaign and political apparatus behind Ms. Powell, to elect her and to control her vote, so they could control New Castle County Council, the legislative body for the County.

16. However, a 20 year retired NCC police officer and a Democrat who was not controlled by either Gordon or Freebery stood in the way - David M. Riddell, Jr., plaintiff's husband. In July 2002 he filed to run in the Democratic primary for that seat. His was an independent voice and he opposed Patty Powell and also Gordon and Freebery's goal of controlling four votes in Council. His campaign platform included the issues of independence since he was his own man and not a hand picked Gordon and Freebery candidate as Patty Powell was, the need for responsible development and the need for greater public services below the Canal.

17. What happened next is found in a May 26, 2004, criminal indictment filed by the United States against defendants Gordon and Freebery for engaging in an election scheme concerning that September 2002 primary election of Patty Powell, and also the year 2002 general election, the year 2000 general election, the year 1996 general election, and the year 1994 general election. Under this scheme, defendants Gordon and Freebery "illegally converted and stole County resources to promote and support political candidates and campaigns," (Indictment ¶ 12); caused "County employees to perform political and campaign activities during working hours, on behalf of political candidates," (¶ 13); and directed and caused "at least ten Executive Assistants

to be reassigned and to devote more than 900 working hours, for which the County paid more than $30,000.00 to provide services to the campaigns of Patty Powell and William Tansey for County Council . . . " (¶13 (C)).  Also, on or about August 20, 2002, defendant Freebery directed, caused and coerced at least one NCC employee working under defendant Freebery's supervision to "take vacation days to work in support of the Powell Campaign . . . " (¶ 15 (D)).

18  Defendant Gordon has pled guilty to some of the charges discussed above.  In his written guilty plea, Gordon admitted that he illicitly caused two NCC executive assistants in his employ to work on and contribute to the political campaigns of both Powell and Tansey, all while they were being paid to perform work for NCC.

19.  Janet Smith was an executive assistant for NCC who was criminally indicted along with defendants Gordon and Freebery.

20.  After the indictments, she pled guilty to a crime that she committed while she held public office.

21.  In her written guilty plea, she admitted that she was ordered by defendants Gordon and Freebery to work on the Powell and Tansey political campaigns while being paid for performing duties for NCC.

22.  Her guilty plea also admits that defendants Gordon and Freebery ordered her to direct additional executive assistants to work on these same political campaigns while on NCC time.

23.  Her guilty plea further admits that eventually, more than 900 working hours and $30,000 in labor services were illicitly directed to the Powell and Tansey campaigns.  Then, an additional $10,000 in vacation time was given as a reward to seven of the executive assistants who worked on these campaigns.

24.  Because of their efforts to dictate the outcome of the Powell election campaign,

Gordon and Freebery had abundant motive to take revenge on anyone who opposed their efforts, such as plaintiff who supported the election and platform of her husband who also was a candidate that year.

### C.  Plaintiff's Protected Speech, Vote, Belief and Association

25.  Plaintiff actively campaigned on her husband's behalf and spoke out on the issues he supported, such as his being an independent voice and not a hand picked candidate of Gordon and Freebery.  Her speech made her a prime candidate for revenge by Gordon and Freebery.

26.  On or about August 14, 2002, with plaintiff present and in part at her behest, Lodge No. 5 endorsed the election of plaintiff's husband.

27.  On or about August 24, 2002, Middletown held a Peach Festival.  Plaintiff's husband marched in the parade with plaintiff at his side.

28.  Gordon also attended the Peach Festival parade. Rather than march, he rode in a car with Patty Powell and campaigned for her.

29.  Gordon saw plaintiff wearing a campaign shirt endorsing her husband and passing out literature on her husband's behalf.  He stood within five feet of plaintiff, looked at her, and, while he knew her, he gave her the cold shoulder and he did not acknowledge her in any way.  He did not even say, "Hello."

30.  Plaintiff cast her vote against Powell and for her husband in the primary.  Defendants Gordon and Freebery knew this and it angered and antagonized them.

31.  With the determinative help of defendants, and the illegal assistance identified in the above mentioned criminal indictment filed by the United States, Patty Powell defeated plaintiff's husband in the primary.

32. The Democratic primary was Powell's only real obstacle to election since her district was predominantly and reliably Democratic.

33. Powell then significantly out polled her Republican Party opponent in the November general election.

34. Since her election Powell fulfilled the expectations of Gordon and Freebery. She reliably supported and delivered her vote for them as expected. She was one of four votes defendants Gordon and Freebery could always use to constitute a legislative majority on County Council.

### D. Union Speech, Activity, Belief, Association and Petition

35. Defendants have a well known and historical animus towards FOP Lodge 5 leaders who speak out against their administration or on behalf of the interests of their members. Plaintiff has engaged in such protected speech and activity on many occasions.

36. On or about March 5, 2002, plaintiff was elected to the Board of Directors of Lodge 5. At the same time, she was appointed as Chairperson of the Grievance Committee. She served as the Grievance Representative for the year before she was elevated to Chairperson of the Grievance Committee.

37. As Chairperson of the Grievance Committee and as Grievance Representative, plaintiff has vigorously represented numerous police officers in grievances against their employer. She has recommended legal representation when officers needed legal representation, against the wishes of the defendants. She has educated FOP members on their rights concerning workers' compensation issues (including the drafting and circulation of a memo detailing officers' rights), and otherwise educated FOP members on their rights.

8

38. She has spoken out against the Police Department's mistreatment of its officers.

### E. Plaintiff's Qualifications

39. Plaintiff is a 19 year veteran of the NCC Police Department. She currently holds the rank of Senior Sergeant.

40. She holds Bachelor of Arts Degrees in both biology and psychology from the University of Delaware. She attended Georgetown University Medical School for one year in their Physiology Program, then applied to become a NCC police officer due to the expense associated with her enrollment there. She is a certified instructor of police recruits. She has taken numerous leadership and management training courses in both the military and police fields.

41. She was a member of the NCC Police Department's S.W.A.T. team. As such, she conducted high risk search/arrest warrants, provided protection for visiting dignitaries, and maintained proficiencies in special weapons and stealth tactics.

42. From 1986 through 1994 she was a member of the United States Air Force Delaware Air National Guard, attaining the rank of Staff Sergeant and served in operation Desert Storm in the Persian Gulf. She served as an Air Evacuation Medic (C-130) and was chosen to be a Team Leader in charge of approximately 100 students in the technical training phase of an Air Medic's education. While in the Air Force, she was an honor graduate from basic training, an honor graduate from technical training school, and the top graduate from noncommissioned officer training school. She was honorably discharged.

43. Plaintiff has held the following positions with the NCC Police Department:

•  Patrol Supervisor, Southern Patrol, 2005-present. So far, as patrol supervisor for the Southern District, she has performed as acting Lieutenant as needed, managed the attendance and time cards of assigned officers, prepared Monthly Police

Reports detailing her officers' activities, attended and graduated from a four
months leadership school (the West Point Leadership Command School), served
on the Career Enrichment Committee and attended Staff meetings as needed.

- Patrol Supervisor, Northern District, May 24, 2004 - 2005.  So far, as patrol
  supervisor for the Northern District, she also performed as acting lieutenant as
  needed and managed numerous part I crime scenes, including but not limited to,
  homicide, barricaded subjects, suicide and suspicious deaths, arsons, and rapes.

- Patrol Supervisor, Central District, October 25, 2001 - May 23, 2004.  While
  patrol supervisor for the Central District she also performed as acting lieutenant as
  needed and managed numerous part I crime scenes, including but not limited to,
  homicide, barricaded subjects, suicide and suspicious deaths, arsons, and rapes.

- Patrol Supervisor, Southern Patrol, October 4, 1999 - October 25, 2001.  While
  Southern Patrol Supervisor, she performed as acting lieutenant as needed,
  managed the attendance and time cards of assigned officers, prepared and
  delivered the Middletown Monthly Police Report for the town of Middletown, and
  attended Staff and lieutenant meetings as needed.

- Supervisor of Police Athletic League, June 14, 1999 - October 3, 1999.  As such,
  she was the Commander of the P.A.L. Youth Academy, created a course outline
  and guidelines for academy participants, created the graduation program, arranged
  for guest speakers, and procured a facility, food, refreshments, and awards.

- Supervisor of Family Services Squad, March 4, 1998 - June 13, 1999.  As such,
  she was elected the Chairperson while serving on the Child Death Review Board, a
  Board member of the Child Advocacy Center Review Board, a Board member of
  the Child Abuse Review Committee, and liaison officer between the NCC Police
  Department and the Department of Family Services.  She also supervised the
  investigation of two natural child deaths and two child homicides, as well as many
  child sexual and physical abuse cases.  In addition, she instructed in the NCC
  Police Department Recruit Academy.  She also was responsible for case
  assignment, tracking and review.

- Patrol Supervisor, Northern District, January 10, 1997 - May 3, 1998.  As such,
  she was responsible for overseeing the Field Training Officer program, was a
  responding supervisor in charge of crime scene management and preservation for
  one homicide, one shooting/robbery, and numerous other part I crimes.  She also
  was tasked with and designed the layout for a more "work friendly" patrol
  lieutenants office, and she was responsible for employee evaluations,
  acknowledgment, discipline, and training.

- Detective for the Property Squad, CIU, January 16, 1995 - January 9, 1997. As such, she was responsible for the review and investigations of property crimes within an assigned district, assisted with homicide investigation, shootings, rapes, etc., organized and conducted surveillance as needed, and took on the additional duty of police composite artist.

- Mounted Patrol Officer, March 16, 1992 - January 15, 1995. As the first female mounted patrol officer ever, she performed patrol of problem areas within NCC, performed terrain searches for crime scenes and missing persons, performed traffic services duties from horseback, trained for and competed in two National Mounted Competitions, and was temporarily assigned to serve on the Rape Task Force.

- Patrol Officer for numerous patrol areas, June 27, 1988 - March 15, 1992. As such, she performed standard patrol duties aimed at public safety.

44. While a member of the Police Department, she also received the following awards: Outstanding Police Recruit, Commendation of Heroism, Commendation of Merit, Unit Citation, and three physical fitness awards.

### F. The Five Vacancies for Promotion to Lieutenant

45. Since the Democratic Primary election in September 2002 there have been at least five opportunities for promotion to lieutenant in the Police Department.

46. But defendants filled those positions with less qualified officers in retaliation for plaintiff's protected activities.

47. Plaintiff applied for each of these vacancies.

48. She was the most qualified candidate for each of these vacancies.

49. Each vacancy was given to a person who had not engaged in protected activity and who was less qualified than plaintiff by any objective measure.

### G. The Managerial Duties of Lieutenants

50. The Police Department is a paramilitary organization.

11

51.  There are approximately thirteen uniformed officers with the rank of lieutenant in the Department.

52.  All the lieutenants are managers, and they are not policy makers.

53.  The lieutenants do not report organizationally to the Colonel or perform advisory functions for him.

54.  The lieutenants are four levels organizationally below the Colonel.

55.  The lieutenants are non-policymaking, nonconfidential government employees.

56.  The lieutenants do not act as an advisers or formulate plans for the implementation of broad goals within the Department.

57.  The lieutenants do not have meaningful input into decision-making concerning the nature and scope of any major government program.

58.  Accordingly, a difference in political beliefs would not be highly likely to cause a lieutenant to be ineffective in carrying out the duties and responsibilities of the lieutenant position.

59.  The private political beliefs of the lieutenants do not interfere with the discharge of their public managerial duties.

60.  Political party affiliation or political beliefs are not appropriate requirements for the effective performance of the rank of lieutenant in the Police Department.

61.  Political party affiliation or political beliefs are not highly likely to cause any lieutenant to be ineffective in carrying out his or her duties in the Department.

62.  Lieutenants do not have meaningful input into decision making concerning the nature and scope of major Police Department programs.  Rather, the Colonel, the County Executive, and the Chief Administrative Officer make all meaningful decisions as to the nature and scope of all

major Police programs.

63.  The position of lieutenant can be effectively performed by someone with political

beliefs and associations differing from those of the County Executive, the Chief Administrative

Officer, and/or the Colonel.

## H.  All Officers May Engage in Off-Duty Political Activity

64.  The public policy of the State of Delaware, as specifically enacted into law by the

Delaware General Assembly in the Law-Enforcement Officer's Bill of Rights, provides that:

> A law enforcement officer . . . has the same rights to engage in political activity as are
> afforded to any other person.  The right to engage in political activity shall not apply to
> any law-enforcement officer while on duty or when acting in an official capacity or while
> in uniform.

11 Del.C. § 9200(a) (2002).  Included in the definition of law enforcement officers are "sworn

member[s] of . . . the New Castle County Police" at the rank of Captain or below.  11 Del.C. §

9200(b).

65.  Similarly, pursuant to the New Castle County Code, County officials and employees

are prohibited from coercing classified/merit employees for partisan political purposes and from

causing classified employees to use their official authority for the purpose of affecting the result of

an election.  NCCC § 26.01.001.

66.  Under the New Castle County Code, police officers are considered classified/merit

employees.

## I.  Revenge and Retaliation by Defendants

67.  Defendants were aware of plaintiff's political and union speech, and other protected

activities.  They were also aware that plaintiff actively campaigned for and voted for her husband

in the primary election.

68. Defendants were angered and antagonized by plaintiff's political, union and other protected activities.

69. In September 2002, plaintiff then applied for a promotion to lieutenant. This application was valid for one year. But despite being more qualified than the four officers who were promoted, plaintiff did not receive any promotion. From September 2002 until August 2003, the four lieutenant vacancies which were filled were:

- David McAllister (who subsequently became the Colonel and a defendant in this case) - 9/24/02;

- Craig Weldin - 9/24/02;

- Robert McLucas - 5/12/03;

- Michael McGowan - 5/12/03.

70. On or about October 9, 2002, plaintiff also was denied FOP leave to attend the FOP State Convention in Ocean City, Maryland. The FOP contract with NCC indicates that FOP leave will be granted as long as staffing allows. Another supervisor then told plaintiff that he was willing to cover her shifts and defendant Cunningham was aware of this. But plaintiff was still denied the FOP leave.

71. On or about November 26, 2002, plaintiff submitted a memo requesting a transfer to the Southern Patrol Unit due to child care issues. This request was not addressed by Cunningham.

72. On or about May 6, 2003, Cunningham sent an e-mail regarding FOP leave versus vacation leave. He stated that FOP leave counted against the nine days which officers were

allowed to take during the summertime. But FOP leave is actually designated as administrative leave and should not be counted against summertime leave when officers and their families take vacation. But as a result of Cunningham's position, plaintiff could not arrange a family vacation during the summer.

73. On or about August 13, 2003, plaintiff submitted two memos through the chain of command to defendant McAllister. One of these memos was an application for an opening for a supervisor in the Mounted Patrol Unit. Another request was for polygraph training. But the Mounted Patrol Unit position was given to an officer who was less qualified for the position than plaintiff and who had never even served in the mounted patrol unit, while plaintiff had previously served there.

74. Although plaintiff had all the qualifications for and was a prime candidate for polygraph training, she also was denied this training allegedly solely because she was a supervisor. McAllister told her "We are short Sergeant's on the street and need experienced Sergeant's out there." But in contradiction to this claim he then transferred a patrol Sergeant to be a supervisor in charge of the polygraphists and the Evidence and Detection Unit.

75. On or about August 2003, plaintiff submitted another request to be transferred to the Southern Patrol Unit due to child care issues. Despite a discussion with McAllister on the subject where he assured plaintiff that she would be accommodated, instead she was not transferred there. However, a Sergeant who did not even request a transfer to the Southern Patrol Unit was transferred there instead by McAllister on February 9, 2004.

76. On or about August 2003, McAllister demeaned Lodge 5 union officials and declared at a staff meeting, "That's the last time I let 14 of those assholes go at the same time." He was

referring to the FOP members who attended the National Convention in Rhode Island.

77.  On or about September 2003, plaintiff again applied for a fifth promotion to lieutenant.  This application was valid for one year.  But despite being more qualified than the officer who was promoted, plaintiff did not receive that promotion which went to Wendy Hudson in September 2003.

78.  On or about January 4, 2004, plaintiff requested educational leave in order to take a Spanish course which would enhance her policing skills.  McAllister denied that request.

79.  On or about July 27, 2004, the FOP president called a special meeting/event of the Board of Directors.  The event dealt with attending a County Council meeting where it was anticipated that the proposed transfer of $15,000,000 by the County to the City of Wilmington for use in compensating City police officers would be discussed.  This issue was of vital interest to the members of Lodge 5.

80.  According to the FOP contract with the County, an FOP Director is allowed to attend any scheduled or special meetings/events if staffing allows. Plaintiff then spoke with her acting supervisor and was told that staffing was O.K. and she could go to the meeting.

81.  But McAllister saw plaintiff at the meeting.  Within 45 minutes, plaintiff's acting supervisor called her and told her that McAllister was upset that she was at the meeting.  As a result, plaintiff was forced to leave the meeting.

### J.  Damages

82.  As a direct and proximate result of the actions of the defendants as detailed herein, plaintiff has suffered lost wages, earnings and benefits, she will suffer diminished earning capacity and receive less pension and other benefits now and upon her retirement, decreased employment

and earnings opportunities, and other pecuniary losses, emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, anguish, humiliation, embarrassment, injury to reputation, loss of training opportunities, and other non-pecuniary losses and injury.

## IV.  ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

83.  The individual defendants' actions violated clearly established federal constitutional rights of which any official would have known, including two decades of Third Circuit case law prohibiting retaliation against public employees for protected speech.

84.  At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal  constitutional deprivations described above.

85.  At all times material hereto the individual defendants and their agents were acting under color of law.  The federal  constitutional deprivations described herein are fairly attributable to the State.

86.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

87.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

88.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

89.  Their actions were wanton and malicious or taken with  reckless indifference to federal constitutional rights.

17

90.   The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff.

91.   The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiff.

92.   The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

93.   The defendants' actions were motivated by bias, bad faith, and improper motive.

94.   The defendants' actions constitute an abuse of governmental power.

95.   The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

96.   The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

97.   The actions of the defendants were taken pursuant to New Castle County policies, customs and/or practices and were authorized, sanctioned, implemented, permitted, and ratified by officials functioning at a policy making level.

98.   By the policy, custom, and/or practice of officials functioning at a policy making level, the defendants have retaliated against plaintiff.  That policy, custom and/or practice caused a deprivation of constitutional rights.  Additionally, the defendants must have known, or reasonably should have realized, from the nature of their conduct that their policy, custom and/or practice was causing or was likely to cause violations of federal constitutional rights.

**COUNT I  (First Amendment - Free Speech Public Employee Retaliation)**

99.   Plaintiff repeats and realleges paragraphs 1-98 set out above.

18

100.  Plaintiff, in her private capacity as a citizen, spoke out on issues of public concern under the First Amendment, including but not limited to the following: the desirability of the election of her husband for the 6th District of NCC Council, the mistreatment of County police officers by the administration and the filing and prosecution of grievances on behalf of FOP members.

101.  None of this speech was required by her job duties or responsibilities as a sergeant in the NCC Police Department.

102.  By its content, form and context, at all times plaintiff spoke out about matters of public concern.

103.  All of plaintiff's speech was non-disruptive of any interest of her employer and it was on matters of concern to the public at large.  Her speech related to matters of political concern to the community.

104.  The individual defendants were aware of plaintiff's protected speech and it antagonized them.

105.  There is a causal link between First Amendment protected activity on matters of public concern and the adverse action of refusing to promote plaintiff to lieutenant on five occasions, failing to grant her transfer requests, failing to grant her FOP leave, failing to grant her educational leave to learn Spanish, and failing to grant her other training requests.  This is demonstrated by:

(a)     the temporal proximity of events, for example, just weeks after the Powell primary election plaintiff was denied her first promotion,

(b)     circumstantial evidence of a pattern of antagonism following protected activity, such as the anti-Union remark "that's the last time I let 14 of those

19

assholes go at the same time" by McAllister, and Gordon's cold shoulder on August 24, 2002 in Middletown,

(c)    personal knowledge and awareness of protected activity by the individual defendants, such as Gordon's knowledge that plaintiff was campaigning for her husband in Middletown on August 24, 2002,

(d)    violation of state and federal laws and NCC policies regarding the Patty Powell election and the also promotion process to lieutenant in the Police Department,

(e)    the fact that plaintiff was more qualified for the five lieutenant positions than the persons who were promoted instead of her,

(f)    any explanations given for not promoting, not transferring, not agreeing to her requests for leave, and/or not agreeing to her requests for training are unworthy of credence,

(g)    direct evidence from the plea agreements of defendants Gordon and Cunningham, as well as Janet Smith, which provide a predicate for defendants' retaliatory motive,

(h)    the fact that defendants engaged in illegal election schemes where they directed and/or controlled police officers and other county employees to provide services in favor of candidates they approved provides a predicate for defendants' retaliatory motive,

(i)    the evidence as a whole.

106.  First Amendment protected activity was a substantial or motivating factor in the refusal to promote and/or transfer plaintiff and other adverse action. First Amendment protected activity was a substantial or motivating factor in the refusal to agree to plaintiff's requests for leave and/or training. The natural probative force of the evidence demonstrates causation.

107.  The totality of retaliatory adverse action taken by defendants against plaintiff is sufficient to deter any person of ordinary firmness from exercising their First Amendment right to freedom of speech.

108.  Any reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with the denial of one or more promotions, transfers, leave requests, and/or training requests.

109.  The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiff's First Amendment protected speech on matters of public concern. There is a temporal and causal relationship between plaintiff's aforementioned protected speech and conduct, and adverse employment action.  First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

110.  Plaintiff's constitutional right to freedom of speech has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT II (First Amendment - Petition Clause Retaliation)

111.  Plaintiff repeats and realleges paragraphs 1-110 set out above.

112.  The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiff's First Amendment protected petition.  There is a temporal and causal relationship between plaintiff's aforementioned protected petition, and adverse employment action.  First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

113.  Plaintiff's constitutional right to petition for the redress of grievances has been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT III (First Amendment - Political Association or Belief Retaliation/Discrimination)

114.  Plaintiff repeats and realleges paragraphs 1-113 set out above.

21

115.  Plaintiff is employed by the Police Department, a public employer.  On five occasions, she was denied promotion to the position of lieutenant.  The position of lieutenant does not require a political affiliation or belief.  Defendants are unable to prove that political affiliation or belief are appropriate requirements for the position of lieutenant in the NCC Police Department.

116.  The individual defendants were aware of plaintiff's protected belief and association and it antagonized them.

117.  There is a causal link between First Amendment protected activity regarding plaintiff's political belief and association and the adverse actions of refusing to promote plaintiff on five occasions, denying her transfer requests, denying her leave requests, and denying her training requests.

118.  First Amendment protected political belief and association were a substantial or motivating factor in the refusal to promote plaintiff on five occasions, the denial of plaintiff's transfer requests, the denial of plaintiff's requests for leave, and/or the denial of plaintiff's requests for training. The natural probative force of the evidence demonstrates causation.

119.  The totality of retaliatory adverse action taken by defendants against plaintiff is sufficient to deter any person of ordinary firmness from exercising their First Amendment rights to political belief and association.

120.  Any reasonable person of ordinary firmness would be deterred from exercising their First Amendment rights to political belief and association when threatened with the denial of one or more promotions, transfer requests, leave requests, and/or training requests.

121.  The defendants took action adverse to plaintiff as a direct and proximate result of

and in retaliation for plaintiff's First Amendment protected political belief and association. There is a temporal and causal relationship between plaintiff's aforementioned protected belief and association and adverse employment action. First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

122. Plaintiff's constitutional rights to freedom of political belief and association have been denied under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT IV (First, Ninth and Fourteenth Amendments - Fundamental Right to Vote - Absolute Right)

123. Plaintiff repeats and realleges paragraphs 1-122 set out above.

124. Plaintiff voted for her husband instead of Patty Powell in the 6th District NCC Council election.

125. The individual defendants were aware of plaintiff's exercise of her right to vote, it antagonized them and it was either the sole, motivating, substantial, or determinative cause for denying any of the five promotions to plaintiff, any of plaintiff's transfer requests, any of plaintiff's leave requests, and/or any of plaintiff's training requests.

126. Defendants have retaliated against plaintiff for following her conscience and exercising her fundamental right to vote for a candidate which her conscience dictated.

127. Defendants also have retaliated against plaintiff and conditioned promotion to higher department rank, approval of transfer requests, approval of leave requests, and/or approval of training requests upon plaintiff surrendering her fundamental right to vote for a candidate of her own choosing.

128. By conditioning promotion upon surrendering her fundamental right to vote,

defendants seek to force plaintiff to choose between following the dictates of her conscience and her continued employment.

129. In so doing, defendants force plaintiff to choose between promotion to a position for which she is well-qualified and her fundamental right to vote.

130. Also in so doing, defendants force plaintiff to choose between the granting of her transfer requests and her fundamental right to vote.

131. Also in so doing, defendants force plaintiff to choose between the granting of her leave requests and her fundamental right to vote.

132. Also in so doing, defendants force plaintiff to choose between the granting of her training requests and her fundamental right to vote.

133. Defendants' actions give rise to an unconstitutional condition since defendants seek to deny plaintiff the privilege of promotion, transfer, leave, and/or training on the basis of her exercise of her constitutionally protected fundamental right to vote.

134. Plaintiff is being penalized and inhibited from exercising her constitutionally protected fundamental right to vote for a candidate of her own, and not of the County Executive, Chief Administrative Officer, and/or Colonel's own choosing.

135. By conditioning her promotion, transfer, leave, and/or training upon a change in her voting habits and political beliefs, defendants seek to produce a result indirectly which they could not directly constitutionally command.

136. In this case the fundamental right to vote is absolute and it has been illegally infringed.

137. Plaintiff's fundamental right to vote has been denied under the First, Ninth and

Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT V (Fourteenth Amendment Equal Protection - Fundamental Right - First Amendment - Strict Scrutiny)**

138.   Plaintiff repeats and realleges paragraphs 1-137 set out above.

139.   The First Amendment rights of speech, belief  association and petition are fundamental rights guaranteed to plaintiff under the Fourteenth Amendment to the U.S. Constitution.

140.   The political speech, beliefs and associations of a police Sergeant also are rights guaranteed to plaintiff under state law.

141.   Plaintiff engaged in political speech, belief and association supporting candidates and/or ideas of which defendants disapproved.  Plaintiff also engaged in protected speech and petition by filing and prosecuting grievances on behalf of FOP members and by speaking out on how FOP members were being treated by the administration.

142.   In derogation of fundamental constitutional rights the individual defendants created a classification which only allows promotion to lieutenant to those persons who support the candidates defendants support and to those who refuse to exercise their fundamental First Amendment rights.

143.   This classification and discrimination is not justified by any compelling state interest which is narrowly drawn.  It cannot survive strict scrutiny analysis.

144.   Plaintiff's constitutional right to the equal protection of the law has been denied under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT VI (Fourteenth Amendment Equal Protection - Fundamental Right - First Amendment - Rational Basis)**

145.  Plaintiff repeats and realleges paragraphs 1-144 set out above.

146.  The classification and discrimination which the defendants created cannot survive rational basis analysis.

147.  Illegal conduct under state law can never be a rational basis for any legitimate governmental action.  Defendants' conduct is illegal under the Law Enforcement Officer's Bill of Rights.

148.  There is no legitimate basis in fact for the treatment of plaintiff nor is there any rational relationship to any legitimate governmental objective.

149.  Plaintiff's constitutional right to the equal protection of the law has been denied under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**Wherefore**, plaintiff prays that the Court:

(A)  Enter judgment against the individual defendants, jointly and severally.

(B)  Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional rights.

(C)  Enter a judgment against the defendants, jointly and severally, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

(D)  Enter separate judgments against the defendants for punitive damages.

(E)  Issue a mandatory injunction directing the present Colonel to promote plaintiff to the rank of lieutenant in the NCC Police Department.

(F)  Award front pay until plaintiff can be promoted.

(G)  Issue a reparative injunction directing that upon retirement plaintiff's

26

pension and other benefits be calculated as if she had been promoted to the rank of lieutenant as of September, 2002.

(H)    Issue a mandatory injunction ending the continuing illegal actions of defendants and barring them from considering protected speech, belief, association, political affiliation, petition or the right to vote for the candidate of one's choice, whenever considering the promotion, transfer, leave requests and/or training requests of any uniformed officer of the NCC Police Department.

(I)    Issue a mandatory injunction ending the continuing illegal actions of defendants Gordon and Freebery, and their agents, and barring them from interfering or participating in any way whatsoever in the promotion, transfer, leave request granting, and/or training request granting process of the NCC Police Department.

(J)    Issue a reparative injunction directing that the individual defendants place a signed document in plaintiff's personnel file indicating that she was qualified to be promoted to the rank of lieutenant, effective September 2002, and that but for illegal conduct by each defendant she would have been promoted to that rank on at least one other occasion since that date, and apologizing to plaintiff for violating her constitutional rights.

(K)    Enjoin the defendants from retaliating against plaintiff.

(L)    Award plaintiff attorney's fees, costs and pre and post judgment interest for this action.

(M)    Require such other and further relief as the Court deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

27

**MARTIN D. HAVERLY, ATTORNEY AT LAW**

/s/ Martin D. Haverly
**MARTIN D. HAVERLY, ESQUIRE (# 3295)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 654-2255
Martin@HaverlyLaw.com

Attorneys for Plaintiff

Dated: July 13, 2007

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on July 13, 2007, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

William W. Bowser, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899
wbowser@ycst.com

Kathleen M. Jennings, Esquire
Oberly Jennings & Rhodunda, P.A.
1220 North Market Street, Suite 710
P.O. Box 2054
Wilmington, DE 19899
kjennings@ojlaw.com

I also certify that I served this **Pleading** by U.S. Mail on the following individual:

Charles E. Butler , Esquire
1224 North King Street
Wilmington, DE 19801

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

29